IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE § | |
| § | Chapter 11 |
| SERENDIPITY LABS, INC. § | |
| § | CASE NO. 20-68124 (SMS) |
| DEBTOR. § | |

**HALL LOS ANGELES WTS, LLC, HALL LONE STAR ASSOCIATES, LP, AND HALL PHOENIX/INWOOD, LTD.'S CONSOLIDATED OBJECTION TO (A) DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING AND APPROVING BID PROCEDURES IN CONNECITON WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) SCHEDULING AN AUCTION AND SALE HEARING; I APPROVING THE MANNER AND FORM OF NOTICE OF THE AUCTION AND SALE HEARING; I APPROVING THE MANNER AND FORM OF NOTICE OF THE AUCTION AND SALE HEARING; AND (D) GRANTING RELATED RELIEF; AND (II) AN ORDER (I)    APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND I GRANTING RELATED RELIEF; AND (B) DEBTOR'S APPLICATION TO EXPAND THE SCOPE OF EMPLOYMENT OF GLASSRATNER CAPITAL & ADVISORY GROUP, LLC DBA B. RILEY ADVISORY SERVICES TO INVESTMENT BANKER, EFFECTIVE AS OF THE APPROVAL DATE**

**Hall Los Angeles WTS, LLC** ("**Hall WTS**"), secured creditor and collateral agent for the holder of notes under a certain Note Purchase Agreement, **Hall Lone Star Associates, LP** d/b/a Hall Arts Parking ("**Hall Lone Star**"), an unsecured creditor, and **Hall Phoenix/Inwood, Ltd.** ("**HPI**"), a shareholder, (collectively, the "**Hall Parties**") by and through their undersigned counsel, hereby files its consolidated *Objection* (the "**Objection**") to Debtor Serendipity Labs, Inc.'s *Motion for Entry of (I) an Order (A) Authorizing and Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets; (B) Scheduling an Auction and Sale Hearing; (C) Approving the Manner and Form of Notice of the Auction and Sale Hearing; (C) Approving the Manner and Form of Notice of the Auction and Sale Hearing; and (D) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Interest; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 205] (the "**Motion**") as revised

by the *Supplement to Motion of Debtor for Entry of (I) an Order (A) Authorizing and Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, et al.* (the "**Supplement**") [Dkt. No. 237], and Debtor Serendipity Labs, Inc.'s *Application to Expand Scope of Employment of GlassRatner Capital & Advisory Group, LLC dba B. Riley Advisory Services to Investment Banker, Effective as of the Approval Date* [Dkt. No. 204] (the "**Application**") and would respectfully show unto this Court as follows:

## I.
## SUMMARY OF OBJECTION

1.  By its Motion, as supplemented, the Debtor Serendipity Labs, Inc. (the "**Debtor**") seeks authority to establish bidding procedures and sell substantially all of its assets at an opening purchase price of $1,300,000.00, devised from a credit bid on Bay Point Captial Partners II, LP's ("**Bay Point**") DIP loan amount, a purported admin claim to Bay Point, and a $100,000 overbid there above.

2.  By its Application, Debtor seeks authority to expand the professional employment of GlassRatner Capital & Advisory Group, LLC dba B. Riley Advisory Services ("**B. Riley**") to conduct a marketing and sale process as contemplated by Debtor's Motion.

3.  First and foremost, based on the Debtor's current burn rate and the expenses of this sale, the Debtor is going to run out of money before the sale process is completed. The Hall Parties submit that this is likely to occur near the middle of March, whereas the sale process will – under its current timetable – extend well into May. The Debtor has twice delayed proceeding with this contemplated sale process and now is simply running out of time and money to actually accomplish it.

4.  In light of the totality of the circumstances, the combination of the Motion and Application is a transparent attempt by the Debtor to stall while it attempts to find plan partners, where none have existed before, for the purpose of benefiting equity holders to the detriment of creditors. In doing so, the Debtor's Chief Executive Officer and designated representative is not acting

as a proper fiduciary for the estate, and instead appears only to be acting in his own self-interest. The Debtor is merely trying to buy as much time as it can so that it can keep trying to pull a rabbit out of the hat.

5. The Debtor has been in persistent financial trouble since late 2018 due to the practice of the Debtor's management keeping insufficient cash on hand and relying upon last minute infusions from investors and lenders. Upon information and belief, the Debtor's subsidiaries are falling further behind on bills and a number have closed. Meanwhile, the Debtor is quickly bleeding funds from its DIP Loan – principally to legal fees and other administrative expenses – without a decisive path to benefiting creditors. Simply put, there is no benefit conferred to the estate by allowing the Debtor to use a sale process to buy more time while its liabilities increase.

6. The Hall Parties submit that the proposed bid procedures and sale are unreasonable on their face and will not maximize value to the Debtor's bankruptcy estate. The Hall Parties are offering a financially superior plan of reorganization, which would not require the expense of this sale process. There is no sound business justification for conducting a costly sale process, with no reasonable prospect of additional bidders.

7. Further, the bid procedures are constructed to chill bidding – especially considering that the only known other potential bidders are the Hall Parties – and will not serve the best interests of creditors or the estate.

8. Finally, to the extent that the proposed bid procedures and sale are unreasonable, the Hall Parties submit that expanded retention of B. Riley also constitutes an unwarranted expense.

### III.
### ARGUMENTS & AUTHORITIES

9. The Hall Parties object to the relief requested by the Debtor in its Motion, its Supplement, and its Application, and submit that approval of bid procedures and a sale process are

unreasonable at this time in light of the proposed plan of reorganization supported by the Hall Parties, which offers greater than twenty (20%) percent more return to the estate than the Debtor's most recent appraisal and just less than three times the contemplated credit bid of Bay Point.

10. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, Section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* at § 105(a). "To prevent debtors from using section 363(b) as a vehicle for circumventing the creditor protections afforded under Chapter 11 plans, courts have imposed their own non-statutory requirements for allowing liquidation sales before plan confirmation." *In re Slate*, No. 14-03302-5-RDD, 2014 Bankr. LEXIS 4137, at *4 (Bankr. E.D.N.C. 2014) "Concerning court approval of a sale of assets under section 363, the overriding consideration is 'whether a good business reason has been articulated.'" *Id.* (citing *In re Motors Liquidation Co.*, 430 B.R. 65, 83 (S.D.N.Y. 2010)). "More recent decisions have determined that pre-confirmation sales are permissible 'when a sound business purpose dictates such action.'" *Id.* at *5 (citing *In re Taylor*, 198 B.R. 142, 156-57 (Bankr. D.S.C. 1996) (citing *In re WBQ P'ship*, 189 Bankr. 97, 102 (Bankr. E.D. Va. 1995)).

11. Georgia bankruptcy courts have defined this test with four principal elements. The proponent of a sale must demonstrate: (1) adequate and reasonable notice; (2) a sound business purpose for conducting the sale prior to confirmation; (3) that the sale was proposed in good faith; and (4) that the purchase price was fair and reasonable under the circumstances. *In re Tom's Foods, Inc.*, No. 05-40683 RFH, 2005 Bankr. LEXIS 2062, at *5 (Bankr. M.D. Ga. 2005).

12. Other courts have identified the following additional factors to be considered along with those four: (5) the proportionate value of the asset to the estate as a whole; (6) the amount of elapsed time since the filing; (7) the likelihood that a plan of reorganization will be proposed and

confirmed in the near future; (8) the effect of the proposed distribution on future plans of reorganization; (9) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (10) which of the alternatives of use, sale or lease the proposal envisions; (11) whether the asset is increasing or decreasing in value; (12) does the estate have the liquidity to survive until confirmation of a plan; (13) will the sale opportunity still exist as of the time of plan confirmation; (14) if not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors; and (15) is there a material risk that by deferring the sale, the patient will die on the operating table? *In re GMC*, 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009) (citing *Comm. Of Equity Sec. Holders v. Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1893)).

13. Each of the factors recited "go to the ultimate questions that the *Lionel* court identified: Is there an 'articulated business justification' and a 'good business reason' for proceeding with the sale without awaiting the final confirmation of a plan." *Id.*

14. Based upon this central concept, the Hall Parties submit that, in light of the factors, the Debtor has not shown an articulated business justification or good business reason to proceed with the sale process instead of the Hall Parties' contemplated plan of reorganization.

15. In form, the Debtor seeks a liquidation sale that would dispose of almost all assets of the estate and distribute to creditors whatever is left after paying its administrative expenses. Thus far, the Debtor has sought to do so based upon a floor bid that is substantially less than its most recent appraisal. This would leave the likelihood of a reorganization of the Debtor at near zero. Moreover, the Debtor has been in bankruptcy six (6) months without filing a plan of reorganization.

16. Alternatively, the Hall Parties – representing approximately 45% of the estate debt – are ready and able to propose and confirm a plan. With necessary permissions from the court, the Hall Parties could propose and confirm a plan in the near future with a sizably greater return offered to creditors than the sale process.

17. More importantly however, there is simply no rational business justification for pursuing a sale process when there is a viable option for reorganization on the table from the Hall Parties. Upon information and belief, the Hall Parties submit that the Debtor's purpose in doing so is not so that a sale can actually take place, but instead to buy more time in its pursuit of a plan that favors equity. Each of the evidentiary burdens of the Debtor must be analyzed in that light.

18. The sale process is almost certain to result in the creditors and estate losing out on value, while incurring additional unnecessary expenses to pursue the same. Based on the Debtor's own admissions of its prior marketing in 2020, there is no reason to believe that there are any interested parties aside from Bay Point and the Hall Parties. With the affirmative knowledge before it, the Debtor seeks to sell at a price based on a now withdrawn stalking horse bid from Bay Point at a valuation of less than half of its most recent going-concern valuation. In fact, there is no guarantee that a Bay Point credit bid will yield any recovery for creditors after the Debtor uses Bay Point's DIP loan money for operations, pays the sale expenses and fees, and pays administrative claims. There is simply no business justification for undergoing this sale process – and employing B. Riley therein – without reasonable prospects of higher bids and an exceedingly low floor-bid established by Bay Point.

19. Moreover, the Bid Procedures as proposed provide decisive advantages to Bay Point in the bidding process and is structured to chill bidding by others. The Bid Procedures (i) still contemplate the breakup fee as part of the floor bid; (ii) summarily blocks partial sales of assets; (iii) fail to provide for the disclosure of reasonable information to interested parties; and (iv) allows the Debtor to select a winning bid based on retention of senior management.

### A. The Proposed Sale Process is Expensive and the Debtor is Likely to Run Out of Money Before it can Conclude

20. As proposed, the sale process will cost the Debtor $300,000 or more without any reasonable expectation of a higher return. Moreover, the Hall Parties are likely to bid lower under the sale process as opposed to under the ordinary plan process.

21. In the first five and half months of this bankruptcy, the Debtor has lost on average approximately $160,000 per month, not counting legal fees for November and December which have not yet been presented to the Court or estate for approval. Conservatively assuming $60,000 in legal fees, the Debtor will average bankruptcy losses of approximately $180,000 per month. Adding to that the sought after B. Riley breakup fee and sale process expenses and the logical conclusion is that the Debtor cannot afford to run a sale process.

22. As the Debtor's reporting shows, it had approximately $660,000 in cash at year end. If one assumes it will cost approximately $100,000 of lawyer fees for the Debtor to complete the sale process and that B. Riley receives at least $100,000 (including its three (3%) percent bonus for gained incremental value[1]), then the Debtor effectively has $460,000 of liquidity to survive on. The sale process as contemplated will take sixty (60) days from whenever it starts, plus an additional forty-five (45) days to close. Consider then, that if the sale process starts on February 8, 2021, it would be complete by April 8, 2021, with a closing near the end of May 2021. At a burn rate of $180,000 per month, the Debtor will run out of money by the middle of March 2021 – never making it to completion of the sale process[2].

---

[1] B. Riley's corporate representative indicated at deposition on January 18, 2021 that the bonus for incremental value gains might increase to four (4%) percent.
[2] Upon information and belief, the Debtor's subsidiaries are also building up substantial payables in the interim.

23. There is simply not enough gas left in the tank for the Debtor to successfully conduct the sale process. Moreover, all such expenses are unnecessary and not likely to lead to increased recovery for the creditors or estate.

24. In addition, the sale process provides no incentive for the Hall Parties to maintain their current financial offer. The Hall Parties are very likely to bid at an amount only marginally better than the current Bay Point floor price. The result of this will clearly be less recovery for creditors.

25. The Hall Parties are prepared to move expeditiously to propose and confirm a plan of reorganization, generating additional benefit to creditors. In addition, nothing in the relief sought by the Hall Parties would eliminate the Debtor's ability to propose a competing plan, should it find the investment partner its searching for. The Debtor has identified no reason – other than delay – why it would need a sale process to do so.

**B. There is No Sound Business Purpose for Conducting the Sale and Hiring B. Riley When a Potentially Confirmable Plan of Reorganization Exists**

26. The Hall Parties have submitted a plan of reorganization that decisively pays the creditors more than the original Bay Point floor bid (the "Hall Plan").

27. The Hall Plan proposes to pay nearly three (3) times what Bay Point has offered to pay for the Debtor; however, the willingness to pay this sum is foundationally predicated upon being able to acquire the Debtor through a plan of reorganization without delay. Not being able to do so will prevent the capture of substantial Debtor assets, particularly the Debtors' Net Operating Losses.

28. Functionally, the creditors and the estate will invariably be worse off under the sale process as opposed to under the Hall Plan because (1) the sale process is expensive; (2) there is no guarantee the Hall Parties will bid in the sale process; and (3) if the Hall Parties do bid in the sale process, it will likely be lower than the amount currently contemplated under the Hall Plan.

### C. The Debtor has Already Exhausted Marketing, Leaving No Reason to Believe This Sale Process would be Fruitful Beyond Bay Point and the Hall Parties

29. By the Debtor's repeated admissions, it has contacted known-players in the coworking industry and believed that it had exhausted those channels prior to presenting this Motion.

30. The Debtor was having substantive discussions with other coworking ventures as early as 2019 and has been conducting its own marketing process during the course of these bankruptcy proceedings. The Debtor has even given interviews, presumably to try and promote interest through the public media. None of these efforts has resulted in higher or better offers. In fact, the only active interest beyond Bay Point are the Hall Parties.

31. Note, that the Debtor has already continued its request for bid procedures twice[3]. If its truly thought there were other interested parties, it would have pressed forward months ago.

32. Again, there is no evidence before this Court that this situation has changed and the Debtor presents no reason to believe that the marketing or sale process will bring in new buyers or increased bidding, beyond mere conjecture.

### D. The Floor Bid, Based on the Withdrawn Stalking Horse Bid, is Significantly Less than the Most Recent Valuation of the Debtor

33. On September 25, 2020, GlassRatner issued a Summary Valuation Report ("**Valuation Report**"), attached as **Exhibit "A"** hereto. The Valuation Report concluded, based on a substantive analysis, that on a going-concern basis, the Debtor was worth $2,546,325 as of July 19, 2020.

34. By simple math, the floor bid, which is based on the withdrawn stalking horse bid of Bay Point, is $1,246,325 less than this most recent valuation. Analyzed another way, the Bay Point bid is only fifty-one (51%) percent of the last valuation. There is no evidence before this Court that the Debtor's value has changed since the Valuation Report.

---

[3] The Hall Parties did agree to the first continuance request.

35. The floor bid is not a reasonable offer, considering the above, and constitutes a fire-sale floor in a sale process. The Hall Parties submit that such a low initial valuation will chill bidding and result in less recovery for the estate.

### E. The Proposed Bid Procedures Will Chill Bidding and Fail to Maximize Recovery to the Estate

36. The Hall Parties further object to the Motion, as supplemented, on the basis that the design of the bid procedures will likely chill bidding and therefore result in a further depression of value. Specifically, the Hall Parties object to the following:

   a. The $1,300,000 floor on bidding still contemplates the unapproved $100,000 breakup fee to Bay Point, which is unreasonably especially in consideration of the substantial fees Bay Point is being paid under the DIP Loan and Bay Point no longer being the stalking horse bidder.

   b. There should only be specific conditions to be met to become a Qualified Bidder. Bid Procedure Section (a)(ii) is nebulous and leaves too much discretion to the Debtor to determine who qualifies as a bidder. Evidence of financial capability should be sufficient to qualify and should be limited to only that which is absolutely necessary for such an assessment. The Debtor should not be entitled to request additional financial information at its own discretion under the threat of non-qualification.

   c. Partial sales should not be summarily blocked by Bid Procedure Section (a)(iii)(A)(4) but instead should be evaluated on their merits and whether such possible partial sales represent a higher or better bid.

   d. Retention of employees, especially senior management, should not be a factor in evaluating what is the highest and best offer, as contemplated by Bid Procedures Section (g). According to the Debtor, Bay Point has committed that it "will hire" employees including senior management if it is successful. This is ripe for abuse by the decisionmakers who would be personally enriched by such an arrangement. If a higher dollar offer is made, this should not be a factor the Debtor can use to override it.

   e. The assumption and assignment notice should come prior to the Bid Deadline so that bidders have an opportunity to know what contracts exist that may be acquired and at what price, not after the Bid Deadline as contemplated by Bid Procedures Section (j)(iii).

   f. The Bid Procedures fails to provide clear access to due diligence information. The Debtor should be required to grant access to the existing data room it maintains, or has maintained on its behalf, to interested parties.

**WHEREFORE, PREMISES CONSIDERED**, the Hall Parties respectfully request that this Court enter an order (i) denying the Motion, the Supplement, and the Application; and (ii) granting such other and further relief as this Court deems just and proper.

DATED: January 18, 2021                Respectfully submitted,

**LAW OFFICES OF FRANK J. WRIGHT, PLLC**

By: _/s/ Frank J. Wright_
    Frank J. Wright [*pro hac vice admission*]
    Texas Bar No. 22028800
    Jeffery M. Veteto
    Texas Bar No. 24098548

2323 Ross Avenue, Suite 730
Dallas, Texas 75201
Telephone: (214) 935-9100
Emails: frank@fjwright.law
        jeff@fjwright.law

and

Eric W. Anderson
Georgia Bar No. 016810
Michael C. Sullivan
Georgia Bar No. 964038
**PARKER, HUDSON, RAINER & DOBBS LLP**
303 Peachtree Street NE, Suite 3600
Atlanta, Georgia 30308
Telephone: (404) 523-5300
Facsimile:   (404) 522-8409
Emails:  eanderson@phrd.com
        msullivan@phrd.com

**ATTORNEYS FOR HALL LOS ANGELES WTS, LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certify that a true and correct copy of the forgoing was served on January 18, 2021 by electronic transmission through the Court's automated Case Management and Electronic Docketing System for the U. S. Bankruptcy Court for the Northern District of Georgia on all parties-in-interest submitting to service of papers in this case, including the persons stated below.

Lee B. Hart
Nelson Mullins Riley & Scarborough LLP
lee.hart@nelsonmullins.com
Atlantic Station | Suite 1700
17th Street NW
Atlanta, GA  30363
**Counsel for Debtor and Debtor-in-Possession**

Shawna Y. Staton
shawna.p.staton@usdoj.gov
362 Richard Russell Building & U.S. Courthouse
75 Ted Turner Drive, S.W.
Atlanta, GA  30303
**Trial Attorney**
**United States Department of Justice**
**Office of the United States Trustee**

                                                          /s/ *Frank J. Wright*
                                                             Frank J. Wright